**ZWILLINGER WULKAN**
Scott H. Zwillinger (SBN 019645)
2020 N. Central Ave., Suite 675
Phoenix, AZ 85004
Tel.: (602) 609-3800
Fax: (602) 962-0207
Email: scott.zwillinger@zwfirm.com

**LEVI & KORSINSKY LLP**
Adam M. Apton (SBN 316506)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Counsel for Plaintiff Ekim Otucu*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ekim Otucu, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Verra Mobility Corporation, David Roberts, and Craig Conti,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Ekim Otucu ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Verra Mobility Corporation ("Verra" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Verra's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Verra common stock between February 24, 2026, to May 26, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities. (the "Class").

2.     Defendants provided investors with material information concerning Verra's growth potential for the full-year 2026. Defendants' statements included, among other things, confidence in the Company's projected revenue outlook and anticipated growth of its Commercial Services segment, assurances of contract renewals with major rent-a-car ("RAC") customers, and growth in its rental car tolling business.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Verra's relationship with Avis Budget Group ("Avis"), and in particular obtaining a contract

1
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

extension with Avis. Further, the Company minimized concerns that major RACs could replace Verra with in-house solutions or outsourced alternatives. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Verra's securities at artificially inflated prices.

4.      The truth emerged after the market closed on May 26, 2026 when Verra issued a press release announcing a termination notice from Avis regarding its contract and accordingly lowered its 2026 full-year financial outlook. Almost one week later on June 1, 2026, the Company announced a sudden and surprising transition of its President and Chief Executive Officer David Roberts.

5.      Investors and analysts reacted immediately to Verra's revelation. The price of Verra's common stock declined dramatically from a closing market price of $13.08 per share on May 26, 2026, Verra's stock price fell to $3.85 per share on May 27, 2026, a decline of about 71%.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant Verra's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# THE PARTIES

11.    Plaintiff purchased Verra common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Verra is attached hereto.

12.    Verra Mobility Corporation is an Arizona corporation with its principal executive offices located at 1150 North Alma School Road, Mesa, Arizona 85201. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "VRRM."

13.    Defendant David Roberts ("Roberts") was, at all relevant times, the President, Chief Executive Officer and Director of Verra.

14.    Defendant Craig Conti ("Conti") was, at all relevant times, the Chief Financial Officer of Verra.

15.    Defendants Roberts and Conti are sometimes referred to herein as the "Individual Defendants." Verra together with the Individual Defendants are referred to herein as the "Defendants."

16.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Verra's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

3

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

17.    Verra is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Verra under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Company Background

19.    Verra Mobility Corporation provides smart mobility technology solutions in the United States, Australia, Europe, and Canada. It operates through three segments: Commercial Services, Government Solutions, and Parking Solutions. The Commercial Services segment offers automated toll and violations management, and title and registration solutions to rental car companies, direct commercial fleet owner-operators, fleet management companies, and other fleet owners.

*The Defendants Materially Misled Investors Concerning*
*Verra's Contract Renewal Negotiations With Avis*
*Budget While Reaffirming Guidance for the Full Year 2026*

*February 24, 2026*

20.    On February 24, 2026, Defendants published positive fourth quarter and full year 2025 financial results, particularly in its Commercial Services segment. The press release also announced the Company's 2026 Full Year Guidance, stating, in relevant part:

**Fourth Quarter 2025 Financial Highlights**

**Revenue**: Total revenue for the fourth quarter of 2025 was $257.9 million, an increase of 16% compared to $221.5 million for the fourth quarter of 2024. Service revenue growth was 14%, driven by 21% growth in our Government Solutions segment and 10% growth in our Commercial Services segment.

. . .

4

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Fourth Quarter 2025 Segment Detail**

***The Commercial Services segment generated total revenue of $108.1 million, a 10% increase compared to $98.7 million in the same period in 2024.*** Segment profit was $69.1 million, a 7% increase from $64.6 million in the prior year period. ***The increases in revenue and segment profit compared to the prior year period resulted from an increase in product adoption, tolling activity, and our European operations,*** partially offset by lower revenue from our fleet management business due to prior period customer churn. The segment profit margin was 64% for the fourth quarter of 2025 and 65% for the fourth quarter of 2024.

. . .

**Full Year 2025 Financial Highlights**

**Revenue**: ***Total revenue for fiscal year 2025 was $979.1 million, an increase of 11% compared to $879.2 million for fiscal year 2024.*** Service revenue growth was 9%, driven by 13% growth in our Government Solutions segment and 7% growth in our Commercial Services segment.

(Emphasis added).

21.    As part of the same press release, Defendant Roberts touted Verra's growth and momentum while expressing confidence in the Company's 2026 outlook, stating, in pertinent part:

We closed 2025 with strong execution and momentum across our three business segments. Total revenue for the fourth quarter increased 16 percent over the fourth quarter of 2024, exceeding our internal expectations while Adjusted EBITDA and Adjusted Earnings Per Share were in-line with our internal expectations. Looking ahead to 2026 and beyond, we are executing against a focused value-creation strategy designed to strengthen our core, enhance profitability and position Verra Mobility for durable long-term growth.

22.    During the accompanying earnings call, Defendant Roberts emphasized the stability and growth prospects of Verra's Commercial Services segment, stating, in pertinent part:

Moving on to Commercial Services. ***Fourth quarter revenue and segment profit increased about 10% and 7%, respectively, over the prior year period. Rental car or RAC tolling increased 16% over the prior year period, driven by increased travel volume and product adoption as well as higher tolling activity compared to the fourth quarter of last year.*** The

5

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

growth in RAC tolling was partially offset by a decline in fleet management revenue of about 8% compared to the fourth quarter of 2024 due to the prior period customer churn we had discussed in our second quarter earnings call. *Strategically, Commercial Services remains a durable cash-generative business with clear competitive advantage, while the operating environment is more normalized relative to recent years, we believe that the fundamentals of the business remain solid.*

\* \* \*

*In Commercial Services, we are sharpening our execution, serving customers at their highest point of need and reinforcing cost discipline and prioritizing profitability and cash generation. We're positioning the business to deliver consistent high-quality earnings over time.*

(Emphasis added).

23.    On the same call, Defendant Conti reiterated the strength of the Commercial Services segment primarily driven by rental-car tolling (RAC) growth and positive expectations for 2026 revenue growth, stating, in relevant part:

*CS year-over-year revenue growth was 10% in the fourth quarter. RAC tolling revenue increased 16% or about $10 million over the same period last year, driven by increased product adoption and tolling activity, which benefited from a 1% increase in U.S. travel volume over the prior year quarter.* Our FMC business declined 8% or about $1.6 million year-over-year, primarily driven by prior period customer churn. Additionally, our European operations contributed just shy of $1 billion of growth compared to the fourth quarter of 2024.

*Commercial Services segment profit increased 7% over the prior year, representing a 64% segment profit margin.* The margin decline compared to the prior year quarter was largely driven by a modest increase in credit loss expense and one-time selling, general and administrative costs. For the full year, Commercial Services generated $436 million of revenue or 7% growth over last year. Segment Profit of $283 million resulted in margins of about 65%, an 85 basis point decline over the prior year, driven by ERP implementation costs and modestly increased credit loss expense.

\* \* \*

*In Commercial Services, we expect mid-single-digit revenue growth. We are modeling TSA volume growing about 100 basis points for the full year. In addition, we're expecting FMC revenue to grow mid-single digits over*

6

*the prior year, down high single digits in the first half of the year due to the prior period churn and growing low double digits in the back half of the year due to the easier comps.* For the combined CS business, we expect the first quarter to be our lowest revenue-generating quarter, likely flat compared to the first quarter of 2025, followed by sequential revenue increases in the second and third quarters and then a modest sequential revenue decline in the fourth. Adjusted EBITDA margins are expected to follow the same cadence as sequential revenue.

(Emphasis added).

24.    Also on February 24, 2026, Defendants filed a Form 10-K Annual Report with the SEC for the year ending December 31, 2025. Notably, Defendants reported their "long-standing relationships" with the three largest rental car agencies in the U.S. including Avis Budget Group, stating, in pertinent part:

***Commercial Services***

*Our Commercial Services segment generated approximately $435.8 million in revenue for 2025, or approximately 45% of our total revenue. Commercial Services provides automated toll and violations management and title and registration solutions to RACs, Direct Fleets, FMCs, and other large fleet owners primarily in North America.* Our toll and violations management solutions facilitate timely payment of tolls and violations incurred by our customers' vehicles, accurate transfer of liability on our customers' behalf, and billing of, and collections from, individual drivers. We also manage regional toll transponder installation and vehicle association—a critical and highly complex process for RAC, Direct Fleet, and FMC customers—to ensure that transponders and corresponding toll transactions are associated with the correct vehicle.

*We have long-standing relationships with, among others, the three largest RACs in the United States, Avis Budget Group, Enterprise Mobility, and The Hertz Corporation.* We also have relationships with key European RACs and leading FMCs in the United States. Through our established relationships with more than 50 individual tolling authorities throughout the United States, we provide an automated and outsourced administrative solution for our customers while also providing convenience for vehicle drivers and benefits to tolling and issuing authorities. *Toll management solutions accounted for approximately 39% of our 2025 total revenues.*

(Emphasis added).

7

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*March 3, 2026*

25.   On March 3, 2026, Defendants presented at the Morgan Stanley Technology, Media & Telecom Conference and highlighted its Commercial Services segment as a steady part of its business platform with strong customer relationships and routine renewal discussions with major rental-car companies in the following exchanges:

<Q: James Eugene Faucette – Morgan Stanley – MD & Equity Analyst> So let's delve in a little bit to the commercial segment that you just touched on. So when you think about the key drivers of growth there, you mentioned increased shift to cashless tolls, new toll roads, international expansion, growth in travel generally. How should we generally rank order each of those or any other factors as growth drivers for the commercial segment?

<A: Craig Conti>  Let's go through the growth rubric. *So we've talked about -- Commercial Services being a mid-single-digit grower over the next couple of years. And the way I like to decouple that growth and talk about the pieces are 1/3, 1/3, 1/3. So the first 1/3 is travel demand, right? So Verra Mobility is a net taker of that. People come to the airport, go through TSA and they rent a car. The second 1/3 of that or what we call the secular tailwinds, which David just touched on a little bit, this is the increasing penetration of cashless rows in the United States. So to give you kind of an idea of that, just less than 3/4 of the roads in the United States that are toll roads are fully cashless.*

*The minute that road goes from a cash pay option to a cashless option, the uptake on our product goes up. So that's a tailwind to us. Also, every year, we add new toll roads in the United States, right? So that's the second 1/3 of 1/3, 1/3, 1/3. And then the final piece are what I say are standard growth initiatives. This is continuing to penetrate the fleet market, continuing with new commercial offerings with our RAC customers and growth in title and registration violations in Europe.* So again, really high level, that mid-single-digit growth that we've talked about, 1/3, 1/3, 1/3; 1/3 of it in travel, 1/3 of it secular tailwinds and 1/3 of it in growth initiatives.

<Q: James Eugene Faucette – Morgan Stanley – MD & Equity Analyst> My impression is you guys already have very good representation among the car rental companies as it is. Just kind of where do you have footprint there? And then what kind of incremental fleets should we be thinking about, if any, beyond car rental?

<A: David Roberts> *Yes. So we work with all the 3 major providers here in the U.S. plus a few of the others. When you think about additional*

8

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*fleets, think of what we call the FMC business. FMC business is large corporations that have many vehicles under their purview and they use a third party to both procure and manage many of the services associated with that.*

*So we redistribute our products, which includes toll management, includes violation management.* So when the owner of the vehicle and the driver of the vehicle are not the same, that creates some friction that we solve through our technology. And so for FMCs, we sell tolling, we sell violations. We also do title and registration. So -- just think of license plate stickers and the registration of the glove box. When those cars are moving around, that actually becomes a relatively complicated thing, and we provide solutions for our customers there.

<Q: James Eugene Faucette – Morgan Stanley – MD & Equity Analyst> So back on the U.S. and commercial services, one of the key questions we often get from investors is customer concentration risk within the segment. How should investors think about the cadence of RAC renewals and competitive dynamics for those programs?

<A: David Roberts> *Yes. I mean, look, I think historically, our business has been the #1 provider of solutions to rental car companies around tolling really since the inception of the industry. And so we've got long-dated relationships with these customers. They -- relative to the cadence, they do -- we're in a discussion now with Avis Budget Group, and we have both Hertz and Enterprise would renew next year. And that's very common. There tend to be 3 to 5 years, just depending on the moment of time that we renew the contract.*

*And we've got, I think, what you would say is a pretty impeccable track record of continuing to serve these customers, and we would imagine doing that. As it relates to customer concentration, we recognize that, that's a thing.* When you look at the 3 rental car companies plus New York City, we have customer concentration. We have -- the best way to solve that is through really thoughtful M&A, but we haven't found one that have met our price threshold over the last several years. So we're just going to continue to grow outside. We continue to diversify with other customer types, and we'll settle that over time.

<Q: James Eugene Faucette – Morgan Stanley – MD & Equity Analyst> And then back on some of these renewals, -- how do you think about like the risk of in-sourcing from those customers and managing that? Or what are the things that you typically need to do either from a product or capability or even pricing standpoint to make sure you keep that business?

9

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<A: David Roberts> *Yes. I don't think of in-sourcing as much of an issue as I would -- and we have competitors. We have competitors in the fleet management companies that we go up against. So I would say that's probably a more likely to manage against from our standpoint because it's a very -- what we do is very complex. It sounds quite easy on the face of it, but tolling is highly -- there's 54 different toll authorities that all have different types of standards and they're not one place to plug in. You have to set up accounts with all them.*

So there's a lot of complexity there. So we rely on our commitment to our customers and the ability to do what we do. But we also need to -- I think your last point is continue to invest in the platform, how do we make it faster and easier? How do we make this a more seamless experience for the renter, how do we optimize the experience for both our customer and their customer.

(Emphasis added).

*March 17, 2026*

26.     On March 17, 2026, Defendants presented at the JPMorgan Industrial Conference and reiterated that the Commercial Services segment was a solid part of Verra's business. Notably, Defendant Conti downplayed concerns that major RACs could replace Verra with in-house solutions as they upgrade their tech platforms, and highlighted the Company's longstanding customer relationships and specialized expertise in the following exchanges:

<A: Craig Conti> *So Verra Mobility, if we look at 2025, just south of $1 billion, 94% service revenue, which is basically all recurring revenue. We'll talk about that as we get a little deeper today. Adjusted EBITDA, north of $400 million, 42% margins across the enterprise and free cash flow generation of about $137 million for the trailing 12 months ending 2025.*

\* \* \*

*Let me tell you what we do. I think Tomo gave a pretty nice intro already. The Commercial Services business, which is about 45% of our consolidated revenue in this business, we're the market leader in toll and violation management for commercial fleets. The way that typically shows up is rental cars, although we also do large and medium corporate fleets.*

We do toll services, violation processing and title and registration on behalf of our customers. This is a mid-single-digit organic grower over the next

10

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

couple of years, if you heard, we talked about that in our earnings call. And this is a business that operates in the mid-60s in terms of the EBITDA margin.

<Q: Tomohiko Sano – JPMorgan Chase & Co. – Managing Director> And then, Craig, if you could talk about the rental car, one of your biggest, like 4 big companies, when they think about the -- digitalize their older platform, and then, how you actually ensure your operating -- your Verra operating business model like to help them versus be replaced by their like in-house capabilities?

<A: Craig Conti> Yes. ***This is -- we've worked with each of the rental car companies for 10-plus years. We're very closely integrated with the teams. You can imagine, we're actually integrated with their operating systems because the problem that Verra Mobility solves is when the owner and the driver of the car are different.*** So think about that in a tolling transaction, right? So if you're in a rental car and you go underneath a cashless toll gantry, how is -- how does that tolling authority know that the person driving the car is not the rental car company? They don't, right? So that's where we come in.

***And I think because of the fact that we need to be so real-time, we're always with the customer, and we have very deep relationships to make sure that we -- I go back to the whole reason we exist. We make transportation smarter, safer and more connected, and we serve our customers at their highest point of need. Serving the customer at the highest point of need make sure I'm creating value for that customer every day.***

(Emphasis added).

<u>May 6, 2026</u>

27.     On May 6, 2026, Defendants published their first quarter 2026 financial results and notably reaffirmed the Company's fiscal year 2026 guidance, stating, in relevant part:

Based on our first quarter 2026 results and our outlook for the remainder of the year, we are reaffirming 2026 full year guidance for all financial measures.

Total Revenue of $1,020 million to $1,030 million
Adjusted EBITDA of $405 million to $415 million
Adjusted EPS of $1.32 to $1.38
Free Cash Flow of $150 million to $160 million

11
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

28.    As part of the same press release, Defendant Roberts noted the Company's solid Q1 performance and expressed confidence in Verra's growth trajectory and strong bookings momentum, stating, in relevant part:

We are pleased with our first quarter performance, which reflects a solid start to 2026. We delivered top-line results in line with expectations, with upside in profitability, while continuing to build momentum across our key growth areas. We also saw strong bookings in Government Solutions, reinforcing the long-term value and visibility of that segment. As we look ahead, we are well-positioned for continued growth, supported by a robust pipeline and disciplined execution.

29.    During the corresponding earnings call, Defendants reiterated the health of the Commercial Services segment reporting an increase in RAC revenue of 1% year-over-year. Significantly, Defendant Roberts noted that continuing negotiations with a "significant customer" toward a long-term renewal were "ongoing and constructive," stating, in pertinent part:

*Moving on to Commercial Services revenue declined 4% compared to the first quarter of 2025 due primarily to prior period churn in our fleet management business.* Looking at the remainder of the year, while the price of fuel and events in the Middle East could weigh on travel, household budgets and consumer assessment, we are cautiously optimistic about travel trends. Consumers and business traveler demand for domestic travel continues to be resilient so far, and we remain hopeful that airfare pricing remains affordable and travel volumes remain consistent with the performance year-to-date. *As a reminder, significant customer relationship which represents over 10% of our revenue is currently operating under a short-term contract extension. This contract extension enables us to continue to serve the customer without interruption while we continue to negotiate a long-term renewal. These discussions are ongoing and constructive.*

(Emphasis added).

30.    Defendant Conti added more concrete financial details to the results and reaffirmed full year 2026 guidance, stating, in pertinent part:

*CS year-over-year revenue declined 4% in the first quarter. RAC tolling revenue increased 1% over the same period last year, driven by increased*

12

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*product adoption and tolling activity, which benefited from a 1.5% increase in U.S. travel volume over the prior year quarter.* The core rent tolling growth was offset by about $2 million related to the nonrecurring true-up that I discussed earlier. Our FMC business declined 19% or about $3.6 million year-over-year, primarily driven by the prior period customer churn we have discussed historically. Adjusting for both the prior period FMC churn and the nonrecurring true-up, revenue growth would have been mid-single digits for the quarter.

*                    *                    *

*Based on our first quarter results and our outlook for the remainder of the year, we are reaffirming all guidance measures. As a reminder, the full year 2026 guidance ranges provided on our fourth quarter 2021 earnings call were as follows: we expect total revenue in the range of $1.02 billion to $1.03 billion, representing approximately 5% growth at the midpoint of guidance over 2025. We expect adjusted EBITDA in the range of $405 million to $415 million or adjusted EBITDA margin of about 40%, representing a 250 basis point decline compared to 2025.*

(Emphasis added).

31.     During the question-and-answer segment, Defendants reiterated that Commercial Services remained on track to meet full-year expectations in the following exchange:

<Q: Daniel Joseph Moore – CJS Securities, Inc. – Director of Research> You mentioned, obviously, no change to the full year outlook for Commercial Services. You did say that it was based on a successful outcome of the renegotiation. Is there sort of a timing that you have in mind as it relates to kind of low and high end of the guidance range there?

<A: David Roberts> I would say, obviously, we're very careful when we talk about those things. We're continue to work under our contract. So we wouldn't put a place of timing on that right now, Dan.

<Q: Tomohiko Sano – JPMorgan Chase & Co. – Managing Director> Could you talk about the CS business, the revenue impact from FMC customer churn has bottomed in Q1? And if you could talk about the main drivers for the revenue recovery and the key factors behind the margin improvement and then sustainabilities into -- throughout the year, please?

<A: Craig Conti> So if we think about the CS business, it's down 3.5%. That's the actual total quarter year-over-year in the first quarter. And there's 4 pieces to that bridge. The first piece is the FMC churn, which we've been talking about for a year now. This is the last -- it will impact us in the second

13

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

quarter as well, but this is the most material impact that will have. That was just under $5 million. If I forget about the churn, look at the FMC business that actually grew, right? ***So we grew over $1 million outside of the churn in the quarter. Travel was somewhere between $1.5 million to $2 million positive. And then we had the accounting true-up.***

\*    \*    \*

***So that's how I think about how that looks for the rest of the year, Tomo. And I would lay on top of that where travel is maybe more than you wanted, but I'll just give you the full answer. So it's -- we closed the quarter with 101% or 1.5% growth travel year-over-year. As we sit here as of last night, I think we're about at 101%, which is exactly what we told you we modeled for the rest of the year.*** If I listen to the airlines, they sound cautiously optimistic, I think, is how I would characterize it. ***In terms of domestic demand. So you kind of mix all that up and say, if I take the one-timers out of the first quarter, I -- are already seeing that mid-single-digit growth. If I go forward, it feels like travel is hanging in there. So I feel comfortable with the mid-single-digit growth as we look out to the balance of the year.***

(Emphasis added).

32.    The above statements in Paragraphs 20 to 31 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth of its Commercial Services segment, assurances of contract renewals with major RAC customers, growth in its rental car tolling business and repeatedly affirmed Verra's 2026 full year guidance. In truth, Verra's optimistic plan for continued growth in its Commercial Services business was dependent on its relationship with Avis, and in particular obtaining a contract extension with Avis Budget. Further, the Company minimized concerns that major RACs could replace Verra with in-house solutions or outsourced alternatives, making Verra's 2026 full year guidance increasingly unlikely to be met. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

14

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**The Truth Emerges**

*May 26, 2026*

33.    On May 26, 2026, Defendants issued a press release announcing that the Company received a termination notice from Avis Budget Group regarding its contract, effective September 2026. Accordingly, management lowered its full year 2026 financial outlook as follows:

**Revised 2026 Full-Year Guidance**

Based on the Company's year-to-date 2026 results and outlook for the remainder of the year including the aforementioned termination notice, Verra Mobility is revising its 2026 full-year financial outlook to the following:

Total Revenue of $985 million to $995 million
Adjusted EBITDA of $380 million to $385 million
Adjusted EPS of $1.19 to $1.25
Free Cash Flow of $140 million to $150 million

34.    Defendant Roberts was quoted in the same press release, stating, in relevant part:

*We were surprised and disappointed to receive this notice from Avis Budget Group given our longstanding partnership and the significant time invested by both parties in ongoing extension negotiations. We are now moving decisively to reduce costs, adapt our operations, and position the business for continued growth and future opportunities.*

We are proud of the value our Commercial Services platform delivers by simplifying complex operational processes for fleet operators and enabling customers to focus on their core business. We remain confident in the strength of our platform, our ability to continue innovating, and our capacity to meet customers' evolving needs while mitigating the impact of this development.

Verra Mobility intends to protect its contractual rights, intellectual property, and business interests. Accordingly, the company is reviewing matters related to the parties' negotiations, the handling of confidential information, and the parties' respective rights and obligations under their agreements.

(Emphasis added).

15

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

35. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 24, 2026 and May 6, 2026 earnings and shareholder calls, March 3, 2026 Morgan Stanley Technology, Media & Telecom Conference call and March 17, 2026 JPMorgan Industrials Conference call. On those calls, Defendants continually touted the Company's continued revenue growth of its Commercial Services segment, assurances of contract renewals with major RAC customers and growth in its rental car tolling business and repeatedly affirmed Verra's 2026 full year guidance, while minimizing concerns that major RACs could replace Verra with in-house solutions or outsourced alternatives.

36. Investors and analysts reacted immediately to Verra's revelation. The price of Verra's common stock declined dramatically. From a closing market price of $13.08 per share on May 26, 2026, Verra's stock price fell to $3.85 per share on May 27, 2026, a decline of about 71%.

37. A number of well-known analysts who had been following Verra lowered their price targets in response to Verra' disclosures. For example, Baird Equity Research dropped their price target 60% commenting, "[w]e previously thought the probability of losing a large Commercial Services client was very low given VRRM's scale advantage allows it to absorb costs that would be difficult for RACs to individually absorb and operate profitably. But this premise is now in question, and the loss of either of the other two large RAC clients (each ~10-12% of total revenue) could put the viability of the business in question."

38. Similarly, UBS global research dropped their price target 83% and downgraded to neutral noting, "[a]fter months of negotiation on its contract renewal, Verra Mobility received a termination of agreement notice from Avis Budget (effective the first day of the second week of September), a customer of nearly two decades…we downgrade Verra Mobility on the material reduction in its revenue and profit outlook…along with uncertainty around other major renewals in the Commercial Services segment in 2027."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

39. Deutsche Bank analyst expressed concern and downgraded to hold stating, "[t]his was entirely unexpected by us and the market, and came as a surprise to management amidst contract negotiations…our view was that VRRM was providing value by simplifying complex tolling operations, managing fragmented authority relationships, and enabling RACs to focus on their core business. Avis' seeming ability to insource this (or find another provider), calls into question the entire moat and thesis for VRRM's high margin commercial sales segment which contributes two-thirds of EBITDA in aggregate."

40. Similarly, William Blair analyst downgraded to market perform commenting, "[t]his was a surprising development as Verra had successfully renewed its Avis contract that spanned tolling, violations management, and title/registration many times in a relationship spanning two decades. We were previously under the impression that Verra's 20-year relationship, intellectual property, economies of scale, and scope of services would result in another successful renewal."

41. The fact that these analysts, and others discussed Verra's shortfall and below-expectation projections suggests the public placed significant weight on Verra's prior growth estimates, Commercial Services segment and its competitive advantage with longstanding RAC relationships. The frequent, in-depth discussion of Verra's guidance confirms that Defendants' statements during the Class Period were material.

## Additional Scienter Allegations

42. During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Verra were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the Company's risk of non-renewal of major RAC contracts, insourcing capabilities by RAC customers and increasing customer churn leading to revenue declines in Commercial Services.

43. Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that Verra was well positioned to implement and capitalize upon its growth

17
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

initiatives to reach its full-year 2026 fiscal targets. Defendants further repeatedly claimed contract negotiations with a "significant customer" toward a long-term renewal were "ongoing and constructive" and minimized concerns that major RACs could replace Verra with in-house solutions as they upgrade their tech platforms and highlighted the Company's longstanding customer relationships and specialized expertise.

44. Defendants' scienter was further evidenced by their repeated claims of confidence that Verra would sustain its growth trajectory in its Commercial Services segment and achieve its stated full year 2026 guidance, including assurances of contract renewals with major RAC customers and growth in its rental car tolling business, despite ultimately disclosing the Avis Budget contract termination and withdrawing its full-year 2026 guidance.

45. Defendants' scienter further evidenced by the abrupt and surprise departure of Defendant Roberts from the roles of Verra's President and Chief Executive Officer following the setback. In retrospect, it appears that the Avis relationship was critical to Verra's Commercial Services business and, in particular, the Avis contract extension was necessary in order for Defendant Roberts to maintain his position at the Company.

### Loss Causation and Economic Loss

46. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Verra's common stock and operated as a fraud or deceit on Class Period purchasers of Verra's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Verra's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Verra's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages under federal securities laws.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

47. Verra's stock price fell in response to the corrective events, as alleged *supra*. On these dates, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Verra's Commercial Services business, key customer relationships and growth outlook.

48. In particular, on May 26, 2026, Verra announced a termination notice from Avis Budget Group regarding its contract and lowered its full-year 2026 financial outlook.

### Presumption of Reliance; Fraud-On-The-Market

49. At all relevant times, the market for Verra's common stock was an efficient market for the following reasons, among others:

(a) Verra's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Verra communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Verra was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Verra was reflected in and incorporated into the Company's stock price during the Class Period.

50. As a result of the foregoing, the market for Verra's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Verra's stock price. Under these circumstances, all purchasers of Verra's common stock during the Class Period suffered similar injury

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

through their purchase of Verra's common stock at artificially inflated prices, and a presumption of reliance applies

51.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with materially misleading statements about its financial growth and stability while at the same time omitting then existing material adverse information concerning the Company's advertising practices. Defendants provided the public with information about their operations that failed to account for negative realities concerning their undisclosed conduct.

53.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

54.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Verra who knew that the "forward-looking statement" was false. Alternatively, none of

20

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Verra's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Verra's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Verra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 1, 2026, there were 151 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Verra;

(c)    whether the Individual Defendants caused Verra to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Verra's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

22

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

61.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Verra common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Verra's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

64.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

media that were designed to influence the market for Verra's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

65.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

66.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior manager and/or director of the Company, the Individual Defendant had knowledge of the details of Verra's internal affairs.

67.    The Individual Defendant is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, the Individual Defendant was able to and did, directly or indirectly, control the content of the statements of the Company. As officer and/or director of a publicly-held company, the Individual Defendant had a duty to disseminate timely, accurate, and truthful information with respect to Verra's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Verra's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Verra's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of

24

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

68. During the Class Period, Verra's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Verra's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Verra's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Verra's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

69. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

71. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

25
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

72. During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of his senior position, he knew the adverse non-public information about Verra's misstatements.

73. As officer and/or director of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Verra which had become materially false or misleading.

74. Because of his positions of control and authority as senior officer, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which Verra disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendant exercised his power and authority to cause Verra to engage in the wrongful acts complained of herein. The Individual Defendant therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Verra's common stock.

75. The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of his senior management positions and/or being director of the Company, the Individual Defendant had the power to direct the actions of, and exercised the same to cause, Verra to engage in the unlawful acts and conduct complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76. By reason of the above conduct, the Individual Defendant and/or Verra are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITED THIS 4th day of June, 2026.

**ZWILLINGER WULKAN**

*/s/ Scott H. Zwillinger*
Scott H. Zwillinger
2020 N. Central Ave., Suite 675
Phoenix, AZ 85004

**LEVI & KORSINSKY LLP**
Adam M. Apton
     (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004

*Attorneys for Plaintiff Ekim Otucu*

27
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS